We'll now move to case number five. Fran Watkins v. Riverside Medical Center. This is case number 18-1411. And we'll hear first from Mr. Klein. Good morning, Your Honors, Counsel. Plaintiff Ms. Fran Watkins is back. Ms. Watkins is sitting in the courtroom. In October 2008, Ms. Watkins was hired by Defendant Riverside, an integrated health care facility located in Kankakee, Illinois, as a personal care assistant. She was responsible for assisting residents with their activities of daily living, including cleaning residents' rooms, escorting residents to meals, and assisting them with phone calls, and recreation and toileting. In 2010, Ms. Watkins began working in Riverside's memory care unit. During Ms. Watkins' employment, she underwent training on Riverside's abuse and neglect policy more than ten times each year. She understood that the following conduct could be considered abuse, slapping a resident's hand, pulling a resident's arm, telling a resident to shut up, and yelling at a resident. From March 2014 through March 2016, Ms. Diane Merrick, who is white, held the position of memory care and assisted living manager at Riverside. On September 30, 2014, six years after Ms. Watkins began working for Riverside and six months after she began working for Ms. Merrick, Ms. Watkins went into the room of Irene, who is an elderly resident with dementia, to help her come out to dinner. As Ms. Watkins and Irene headed down the door hallway, Irene started leaning back, saying no. Ms. Watkins was holding Irene's arm. At that point, another nurse, Ms. Virginia Perhak, who is white, walked around the corner, asked Ms. Watkins if she would like assistance, and Ms. Watkins responded yes. Ms. Perhak then walked Irene to the dining room. On October 2, within two days of this incident, just two days later, Ms. Merrick notified Ms. Watkins that her employment was suspended, pending investigation of the abuse allegations, and gave her a written notice of suspension. On that same date, Ms. Perhak reviewed security camera video of the hallway incident between Ms. Watkins and Irene. Ms. Merrick, who made the decision to fire Ms. Watkins, admitted during her deposition that in the video, Ms. Watkins was holding Irene's arm, and Irene was getting upset, and Irene pulled her arm back, away from Ms. Watkins. Next, the video showed Ms. Perhak coming out of the kitchen and assisting Irene back to her room. Ms. Merrick stated in her follow-up report that Riverside had found that Ms. Watkins committed verbal, physical abuse, and Ms. Watkins' employment was terminated, affected October 13, within two weeks of the alleged abuse. Mr. Klein, is it your interpretation of the record that Ms. Watkins was terminated exclusively based upon the incident that was captured on the video that you're referring to? Because my impression from reading the briefs in the file here is that the termination was more the product of what the investigation turned up, as opposed to what was captured on that video. Have I misread the record? There was an investigation in addition to the video, and the investigation included, I think, one of the affidavits that was relied upon was an affidavit of Ms. Virginia Perhak, and in her affidavit, she's alleging she saw Ms. Watkins pull Irene. And I'll go specifically into the transcript, so there's a clear inconsistency and dishonesty, in our opinion, and I think the facts support it. So the first part of your question, certainly, yes, there was more than just the video. However, I think the timing, that it was two days after the video, that Ms. Merrick tells Ms. Watkins that she's suspended, and it's within two weeks of that that she's fired. So I think there was more to it, but I think the video, the timing of that, along with the fact that Ms. Perhak's affidavit was clearly dishonest, when she's alleging that she saw Ms. Watkins pull Irene, and the video clearly shows that Irene pulled away from Ms. Watkins. Well, there were several other incidents, weren't there, with different people, once they did the investigation? There were a couple other incidents of alleged misconduct, yes. Okay. But I think... I'm trying to get the picture. It's sort of like something they didn't know and then found out later after they did an investigation. Well, as far as... I don't know the specifics of either of them. No, but you're certainly correct, Your Honor, as far as there were a couple other issues that were part of the investigation, but our view is that the most significant and the key reason why she was terminated was based on what the video showed, but certainly there were other matters. They will say that alerted them to something, I guess, that she grabbed her arm and did something. I don't know what that video would show, but that brought it to somebody's attention, and then other things came up once that discussion started. I guess that's what happened. Because this is a race case. Yes. Yeah, and... Well, I mean, that's got to be, I guess, the reason, supposedly, that she's being terminated, as opposed to whatever her activities were. We think there's... The video illustrates pretext. As far as the race discrimination, the evidence shows besides Ms. Watkins being terminated, Ms. Little, who gave a certified statement, she stated that besides that she was terminated, that another non-black, Ms. Lorelei, did something similar, was not terminated, and in the case of Ms. Watkins, similar conduct by a Natalie Mesowitz, who was white. There was an investigation that revealed, in her case, that she accidentally hit a resident, but we're talking about similar facts, and two whites were not fired, two blacks were fired. So that's the key part of the race discrimination, in addition to what we believe is very strong evidence of pretext. Would you like to reserve the rest of your time for rebuttal? Oh, yes, thank you. Thank you. We'll now hear from the applee, Mr. Donato. Good morning, and may it please the Court, Counsel. This is a straightforward employment discrimination case. It was rightly resolved on summary judgment. In short, Ms. Watkins was a certified nurse's assistant who worked in the memory unit of Riverside Senior Living Facility, was terminated after an investigation that revealed several instances of patient-related misconduct, including reports of her smacking a resident's hand, pulling a resident's arm, raising her voice at a resident, and telling the resident to shut up before turning up the television volume to drown out the resident's voice. This conduct, of course, violated Riverside's policies and, of course, amply supported Watkins' termination. In particular, Riverside maintains an abuse and neglect policy that prohibits corporal punishment, physical abuse, and mental injury to residents. As my opposing counsel mentioned, Ms. Watkins admits that she was trained on that policy roughly 10 times a year. She understood that that policy prohibited smacking a resident's hand, pulling a resident's arm, telling a resident to shut up, and yelling at residents. Ms. Watkins admits further that she understood that employees who engage in resident abuse or mistreatment are subject to discipline up to and including termination. But yet, despite these policies and these undisputed facts, Ms. Watkins now appeals the entry of summary judgment on her claims of race discrimination and racial harassment. I'll address each one of those claims in turn. With respect to her race discrimination claim, for complete mistake, I'll note that she doesn't have any direct or circumstantial evidence of any sort of discriminatory animus. She uses the word trouble. That's right. As if when saying, are you in trouble or something, that that was translated as some sort of a racial slur. She testified, if I recall correctly, Your Honor, that she testified that she subjectively believed that that constituted some sort of racial slur. That's what I mean. That's right. That's what she says. Correct. Now, consistent with this court's case law, that is not a comment that reflects any sort of, not on its face, any sort of racial character or purpose, calling somebody a troublemaker. It could apply equally regardless of what your race is. So that in itself doesn't give rise, can't create an inference of discrimination. And that's the only evidence that she points to as potentially giving rise to discriminatory animus. There's nothing else on the record whatsoever. She also, counsel also mentioned there was another, I guess, black woman who was also terminated. That's true. She was terminated. She was a probationary employee. She was terminated for a medication error. She admitted that she, if I recall correctly, she admitted that she did not give medicine to a patient. And she did submit a certified statement outside of her personal knowledge. At least there's no basis in the statement to suggest that she would have personal knowledge as to her co-worker's discipline or what she did. But even assuming she had personal knowledge, the co-worker that she references was not a probationary employee. And if I'm not mistaken, there was a different decision maker involved in that instance as well. Okay. What about the other white comparators that she mentioned? Ms. Mesowitz, it's true that there was a report around the same time that there was potential resident abuse allegation. There was an investigation. She was suspended pending that investigation, but ultimately it was determined that she had banged the wheelchair into a wall accidentally. There was no physical harm. There were no other acts of misconduct either, which renders her situation distinct from Ms. Watkins. Ms. Watkins, obviously there were several instances of patient-related misconduct, whereas the record reflects that there was only this one alleged incident with Ms. Mesowitz, and it was determined upon investigation that it was merely an accident. I'd like the court to consider some of the facts that Ms. Watkins conceded on summary judgment. She admits that Ms. Mark, the decision maker here, in fact terminated Watkins for violating Riverside's policy against resident abuse and neglect, and that she was terminated because, quote, it was in the best interest of the residents that Watkins no longer work at Riverside, and that's frankly a dream admission for someone who's defending an employment discrimination case. She conceded on summary judgment that she was terminated for reasons that are unrelated to her race. There are other key admissions that she makes on summary judgment. She admitted, for example, that Ms. O'Gorman, who was a person principally responsible for interviewing the various folks that reported patient-related misconduct, that Ms. O'Gorman has never made any comments related to Ms. Watkins' race, and that she has no basis to believe that she harbors any sort of discriminatory animus. Ms. Watkins further admitted on summary judgment that she had never heard Merrick, aside from the comment that Judge Meaney had mentioned before, make any sort of patently racial remarks. She does contend that she, on a daily basis, called her a troublemaker, but for reasons I've previously said, that's insufficient to give rise to any sort of discriminatory animus. Well, it was sort of a question, do you have any trouble today or something like that? I don't. Is that common parlance for this supervisor? Does she talk to other people that way too? I don't know what the record reflects on that. I do think that there is some contention that the plaintiff didn't hear her ever say that to anybody else, but their shifts only, as I understand it, overlap for a few hours a day, and I don't frankly know whether there's any record evidence  whether they were staying out of trouble. I don't know. I don't have any of my own experience. I have a mother and a sister that went through some things, but it would seem to be a logical question if someone said, is so-and-so causing any trouble today? Because people in those conditions sometimes have problems, and I guess you could say they throw something or get in the way or push somebody else around or do something, and you could say they've had any trouble with so-and-so who may be a person who behaves a little bit out of line. Well, I think, if I'm not mistaken, what the record suggests is that Ms. Marcus ain't directing these comments directly to, not via a resident, but directly to Ms. Watkins. Well, what do you mean by that? In other words, she doesn't finish the sentence. Does he have any trouble today? Doesn't finish the sentence with Mrs. Smith. To my knowledge, there's no evidence of that effect. Okay. Is it correct that as part of the investigation, Ms. Watkins was not interviewed? She was. There was a meeting with her, and she was allowed to submit a statement. Was that before or after the decision was made? The decision, I believe, was after the decision to suspend her. So she was obviously informed of her suspension. Ms. Mark, the decision maker, handed off the investigation to Mr. Gorman. Mr. Gorman interviewed multiple coworkers. At that point, I believe that Ms. Watkins was given a chance to submit a statement and that there was a meeting with her at some point thereafter, in approximately a two-week time frame. If there wasn't a racial animus here and Ms. Watkins disagreed with the nature of the punishment slash separation, she's an Atwell employee. Are there any other avenues of relief Ms. Watkins would have had? To my knowledge, no, but I can't say that definitively. I don't know if she had recourse and didn't avail herself. As far as I know, there's no development of that issue on the record. Okay. As I mentioned, obviously, the conduct that was reported to Riverside was troubling. And I would just say that it doesn't necessarily mean that these things, in fact, occurred. Title VII doesn't prohibit mistakes of judgment. So what Riverside had in hand were multiple reports from multiple different people, none of whom are alleged to harbor any sort of racial animus, that Watkins engaged in clear violations of Riverside's abuse and neglect policy by smacking residents, telling them to shut up, turning up television so loud that residents' voices couldn't be heard. Those are clear violations of the abuse and neglect standard. And the persons from whom that information comes, it's admitted that they don't have any sort of discriminatory animus. Just real quickly, with respect to the racial harassment claim, it's, in my view, woefully deficient. There is no suggestion in the record that the troublemaking comments were connected to. You say troubling. Troublemaking, troubling. No, I'm joking. I mean, this is a word that you just said. Yes, it is. It makes the point that there's that phrase, that term in itself is not connected to a race, and there's nothing else in the record to suggest that it could be connected to a race. She doesn't cite any legal authority to support the contention. She cites a couple of articles that are not even purporting to describe what law is or what it should be. They're just magazine articles. And we've cited authority to the fact that courts have considered whether that very word in itself could give rise to some sort of inference of racial harassment, and those cases hold that it's insufficient, which is obviously not a surprising thing given this court's jurisprudence and the high standard that applies to racial harassment types of claims. We cite a few cases in our brief. It would be indecorous to get into the facts of those cases in an open courtroom, but suffice it to say that it was conduct that's far more extreme than the conduct at issue here and the court has held that that was insufficient to state a racial harassment claim. And we think that this is a fortiori case where if it's insufficient there, it has to be insufficient here because this is clearly not at the same gin. And I see that my time has expired, and unless there are any other questions, I'll conclude. Thank you, Mr. McDonald. Mr. Klein, rebuttal. I just want to refer to what Ms. Merrick, the decision-maker, stated in her affidavit when she was deposed. She was asked, What did you observe on the video? Fran had Irene's arm, and as they were walking down the hall, you could tell that Irene was getting upset about something. I didn't know what, but you could tell she was getting upset, and then she pulled her arm back. It appeared like Fran was helping her down the hall, and Irene pulled her arm away from Fran. This is the decision-maker. This is a key event, and she's admitting that Fran's doing nothing wrong. And Perhak, who's one of the key people in the investigation, she says, I was there, and I saw Fran do this, and the video is saying that didn't happen. So you've got two very strong examples of pretext. You have Merrick, if I hadn't heard, based on an event, a key event, maybe not the sole event, but certainly the key event, and Fran's doing nothing wrong. You've got a video showing, and Merrick admits that. Mr. Klein, on this issue of other avenues that Ms. Watkins may have had, if a determination is made that racial animus was not part of the decision, what other avenues would Ms. Watkins have had to go down to attempt to get some recourse? As far as I know, and she was asked that at her deposition, there were none. I'm quite certain in the depositions, there's certainly no fact that was presented that she had an option. And when Merrick was deposed, she never talked about an option that existed besides what took place. Not some kind of breach of contract claim or something like that? Correct. Well, I don't think a breach of contract would have been because there was no written agreement as far as an employment without a written agreement, which they didn't have anything specific. I don't think that would have been an option that would have been nearly as good as the option that was taken. And as part of the investigation, Mr. Donato made reference to the fact that Ms. Watkins was able to give a statement Was that post-suspension, pre-termination? That's my understanding. All right. Thank you. Also, regarding the word trouble, it was clear that the only time the word trouble was used was to Ms. Watkins. And it wasn't just once. One of the cases that they cited, where it was one, the court used the word benign comment. Here we have the trouble used many times, only used to a black person, never mentioned to any of the white employees. And the two articles, what they refer to is that this type of language, trouble, troublemaker, has been going on for 100 years. It's depicted in movies. It's depicted over time. So you have, besides the subject matter, the subjective nature, you have objective history of the word trouble, troublemaker, lazy. And as Fran said, trouble is often used interchangeable with lazy. And you have this depicted over and over for 100 years, and you have the facts that we have in this case in addition to that. As far as what counsel was saying about the fact 58, I just want to read that specifically. Because there's nothing that was conceded that's significant. Fact 58 says, Merrick concluded, concluded that it was in the best interest of the residents that Watkins no longer work at Riverside. The key word is concluded. That's not a fact. So we admit this is what Merrick concluded. We're not agreeing to any facts. Merrick concluded that it was in the best interest. Do we admit or deny? We admit that was her conclusion. That's all we're admitting. Thank you, Mr. Clark. Thank you. Thank you. The case will be taken under advisement.